## WESTERN UNION TELEGRAPH CO. v. ATLANTA & W. P. R. CO.

(District Court, N. D. Georgia.   September 30, 1915.)

### No. 66.

1. TELEGRAPHS AND TELEPHONES ⬅⬆11—RIGHT OF WAY—CONSTRUCTION OF CONTRACT WITH RAILROAD COMPANY.

   Complainant telegraph company, which with its predecessors had for many years maintained its lines over the right of way of defendant railroad company, entered into a new contract with it for a term of seven years, and after that until terminated by a year's notice.  By one clause of the contract complainant was granted and assured a right of way over defendant's line, to be exclusive so far as defendant could legally make it so, with the right to put up additional wires, etc.  *Held* that, whatever right of occupancy complainant previously had, such contract, voluntarily entered into, measured its future right, which ended when the contract was terminated in accordance with its terms.

   [Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 7;  Dec. Dig. ⬅⬆11.]

2. EMINENT DOMAIN ⬅⬆10—TELEGRAPH COMPANIES—RIGHT OF WAY—CONSTRUCTION OF FEDERAL STATUTE.

   Rev. St. § 5263 et seq. (Comp. St. 1913, § 10072 et seq.) giving telegraph companies which accept its provisions the right to construct and operate their lines over the public lands and over any military or post road of the United States, does not vest such a company with any power of eminent domain, nor confer upon it the right to construct its lines over private property, or the right of way of any railroad company, without consent of the owner.

   [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 35–48;  Dec. Dig. ⬅⬆10.]

In Equity.  Suit by the Western Union Telegraph Company against the Atlanta & West Point Railroad Company.  On motion to dismiss bill.  Motion granted.

Wm. L. Clay, of Savannah, Ga., for plaintiff.

R. E. Steiner, of Montgomery, Ala., and Sanders McDaniel, of Atlanta, Ga., for defendant.

NEWMAN, District Judge. This is a bill filed by the Western Union Telegraph Company, hereafter called the Telegraph Company, a corporation created and existing under the laws of the state of New York and a citizen and resident of that state, against the Atlanta & West Point Railroad Company, hereafter called the Railroad Company, a corporation created and existing under the laws of the state of Georgia and a citizen and resident of the Northern district of Georgia, to enjoin the Railroad Company from removing the Telegraph Company, its wires, poles, telegraph instruments, etc., from and off of the right of way of the Railroad Company.

It appears from the bill that the Telegraph Company has occupied the right of way of the Railroad Company with its poles and wires, and the offices of the Railroad Company with its instruments and appliances necessary for the transmission of messages, for many years. According to the bill the origin of this situation between the parties is somewhat doubtful, except that it is definitely alleged that the Telegraph Company and its predecessors have had their lines along the right of way of the defendant Railroad Company for a long period of time.

It is alleged on information and belief that between the years 1850 and 1860, or prior thereto, the Atlanta & West Point Railroad Company permitting and not objecting thereto, the American Telegraph Company, or the Washington & New Orleans Telegraph Company, or some other telegraph company, established and maintained a line of telegraph wires along the right of way of the defendant Railroad Company, and that it then became a component and important permanent part or link of the plaintiff's telegraph system in the state of Georgia and other states, which line, it is alleged, was intended to be and is of unlimited duration and existence, and that the telegraph line was operated upon and along the Railroad Company's right of way.

It is then alleged that during the year 1861, or thereabouts, the American Telegraph Company, the Washington & New Orleans Telegraph Company, and other telegraph companies having and operating telegraph lines in Georgia and other states which had seceded from the Union, confederated, and a new telegraph company, which was called the Confederate Telegraph Company, took over, acquired, operated, and became seised and possessed of the telegraph lines along the right of way of the defendant Railroad Company, and that they became a part of the system of the Confederate Telegraph Company, operating throughout the Southern States, and as a common carrier transmitted messages over its lines until 1865, when the line or lines were acquired, taken over, and operated by the American Telegraph Company.

It is then alleged that during the year 1865 the Confederate Telegraph Company conveyed and assigned to the American Telegraph Company all its lines and telegraphing property in the state of Georgia

and other states, including its lines upon the right of way of the defendant Railroad Company, and that the American Telegraph Company, which, it is alleged, acquired thereby a perpetual, irrevocable, and assignable easement or right to construct, maintain, and operate the same, operated said lines until 1866, when the American Telegraph Company transferred and conveyed its lines and property, including the line or lines constructed and operated along the defendant's right of way, and said easements, to the plaintiff, the Western Union Telegraph Company.

A company called the Southern Telegraph Company, in 1884, according to the allegations of the bill, constructed and operated a telegraph line along the defendant's right of way, and this company, on a proceeding in the United States Circuit Court of Virginia, went into the hands of receivers. It had issued bonds for a large amount, and, having defaulted in interest, there was a foreclosure of the mortgage. There was, according to the bill, an ancillary proceeding in the United States Circuit Court for the Northern District of Georgia, at Atlanta, in which a decree, previously entered in Virginia, was entered and confirmed, foreclosing the mortgage and appointing commissioners to sell; that there was a sale by commissioners duly appointed, the sale embracing extensive telegraph lines in the Southern States, including its lines on the right of way of the Atlanta & West Point Railroad Company. The Farmers' Loan & Trust Company, pursuant to the decree, joined with the commissioners in the conveyance of the property, which, at its sale, was bought by the New York & Southern Telegraph Company, a corporation of New York, which company, in August, 1888, conveyed the same to the plaintiff, the Western Union Telegraph Company. It is alleged that the receivers of the Southern Telegraph Company operated the lines of that company during the receivership.

The plaintiff Telegraph Company seems to have occupied the telegraph lines then acquired by it over and along the right of way of the defendant Railroad Company until the year 1891, when an agreement was entered into between the Telegraph Company and the Western Railway of Alabama and the Atlanta & West Point Railroad Company, jointly and severally. It is recited in the beginning of the agreement that:

"The Railroad Companies own or control and operate a continuous line of railroad from Atlanta, Georgia, to Selma, Alabama, along which railroad the Telegraph Company owns lines of telegraph poles and wires, which are now operated by the Telegraph Company under the agreement hereinafter mentioned; and whereas, it is desirable in the interest of both parties hereto that a new agreement shall be entered into between them providing for their enlarged wants," etc.

This contract is of some length, and has provisions concerning the construction and operation of lines of telegraph and the respective rights and duties of the parties with reference thereto, and contains nothing very material to the decision of this case until we come to the sixth paragraph or clause of the agreement. That is as follows:

"The Railroad Companies, so far as they legally may, hereby grant and agree to assure to the Telegraph Company the exclusive right of way on, along, and

under the lines, lands, and bridges, and on both sides of the tracks, of the railroads now or hereafter covered by this agreement, and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires, and underground or other lines for commercial or public use or business, with the right to put up or construct, or cause to be put up or constructed, from time to time, such additional wires and such additional lines of poles and wires and underground or other lines as the Telegraph Company may deem expedient, and which may not in any way interfere with, impede, or hinder the operation of the Railroad Companies; and the Railroad Companies agree to clear and keep clear said right of way of all trees, undergrowth, and other obstructions to the construction and maintenance of lines and wires provided for herein, and the Railroad Companies will not transport men or material for the construction, maintenance, or operation of a line of poles and wire or wires or underground or other lines in competition with the lines of the Telegraph Company, party hereto, except at and for the Railroad Companies' regular rates, nor will they furnish for any competing line any facilities or assistance that they may lawfully withhold, nor stop their trains nor distribute material therefor at other than regular stations: *Provided, always, that in protecting and defending* the exclusive grants conveyed by this contract the Telegraph Company may use and proceed in the name of the Railroad Companies, or any of the companies controlled by them, but shall indemnify and save harmless the Railroad Companies and said companies controlled by them, from any and all damages, costs, charges, and legal expenses incurred therein or thereby."

They then provided in the twelfth paragraph or section of the contract as follows:

"The provisions of this agreement shall supersede the following agreements from and after the date hereinafter written, upon which this agreement takes effect, to wit: (1) Agreement dated November 16, 1865, between the Atlanta & West Point Railroad Company and the American Telegraph Company. (2) Agreement dated March 6, 1866, between the Montgomery & West Point Railroad Company and the American Telegraph Company, and any other agreements between the parties hereto or their predecessors, respectively, in the ownership or control of their respective properties."

Then in the thirteenth paragraph or section is this stipulation:

"The provisions of this agreement shall be and continue in force for and during the term of ten (10) years from the 1st day of February, 1891, and shall continue after the close of said term until the expiration of one (1) year after written notice shall have been given after the close of said term by either party to the other of an intention to terminate the same, and in case of any disagreement concerning the true intent and meaning of any of said provisions, the subject of such difference shall be referred to three arbitrators, one to be chosen by each party hereto and the third by the two others chosen, and the decision of such arbitrators or of a majority thereof shall be final and conclusive."

On January 26, 1902, the plaintiff Telegraph Company and the defendant Railroad Company and the Western Railway of Alabama, the two latter jointly and severally, entered into a contract which commences as follows:

"Whereas, the Railroad Companies own or control and operate a continuous line of railroad between Atlanta, Ga., and Selma, Ala., along which railroad the Telegraph Company owns lines of telegraph poles and wires which are now operated by the Telegraph Company under an agreement between the parties hereto, dated the seventeenth (17th) day of January, 1891, the original term of which has expired, and it is desirable in the interest of both parties hereto that a new agreement be entered into between them."

The contract then proceeds very much like the contract of 1891 until it comes to the sixth paragraph of the agreement again, and that paragraph is as follows:

"The Railroad Companies, so far as they legally may, hereby grant and agree to assure to the Telegraph Company the exclusive right of way, on, along, and under the line, lands, and bridges on both sides of the tracks of the railroads now or hereafter covered by this agreement, and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires, and underground or other lines for commercial or public telegraphic and telephonic uses or business, with the right to put up or construct, or cause to be put up or constructed, from time to time, such additional wires and such additional lines of poles and wires and underground or other lines, and to license the use of its poles for such wires, as the Telegraph Company may deem expedient and which may not in any way interfere with, impede, or hinder the operation of the Railroad Companies; and the Railroad Companies agree to clear and keep clear said right of way of all trees, undergrowth, and other obstructions to the construction and maintenance of lines and wires provided for herein, and the Railroad Companies will not transport men or material for the construction, maintenance, or operation of a line of poles and wire or wires or underground or other lines in competition with the lines of the Telegraph Company, party hereto, except and for the Railroad Companies' regular rates, nor will they furnish for any competing line any facilities or assistance that they may lawfully withhold, nor stop their trains nor distribute material therefor at other than regular stations: Provided, always, that in protecting and defending the exclusive grants conveyed by this contract the Telegraph Company may use and proceed in the name of the Railroad Companies, or any of the companies controlled by them, but shall indemnify and save harmless the Railroad Companies and said companies controlled by them, from any and all damages, costs, charges, and legal expenses incurred therein or thereby."

In the twelfth paragraph of this agreement it is provided that:

"The provisions of this agreement shall supersede said agreement hereinbefore mentioned, dated the 17th day of January, 1891, between the parties hereto, and any other agreements between the parties hereto or their predecessors respectively in the ownership or control of their respective properties."

And in the thirteenth paragraph it is provided that:

"The provisions of this agreement shall be and continue in force for and during the term of seven (7) years from the 1st day of February, 1902, and shall continue after the close of said term until the expiration of one (1) year after written notice shall be given after the close of said term by either party to the other of any intention to terminate the same, and in case of any disagreement concerning the true intent and meaning of any of said provisions, the subject of such difference shall be referred to three arbitrators, one to be chosen by each party hereto and the third by the two others chosen, and the decision of such arbitrators or a majority thereof shall be final and conclusive."

The eleventh paragraph of the plaintiff's bill is as follows:

"Your orator and its predecessors in title and estate, for more than twenty (20) years prior to the filing of this its bill of complaint, have been continuously seised and possessed, and have continuously constructed, maintained, and operated, lines of telegraph along the railroad of the defendant and extending continuously from the northern to the southern termini of defendant's said railroad, one of said lines of telegraph being situate on the eastern side of the tracks of defendant or on the left-hand side of those tracks going south, the other line being situate on the western side of the tracks of defendant or on the right-hand side of those tracks south; and your orator and its predeces-

sors in title and estate have for more than twenty (20) years been continuously seised and possessed of, and your ortator is now seised and possessed of, a perpetual, irrevocable, assignable easement or right to construct, reconstruct, maintain, and operate its said line of telegraph along defendant's line of railroad.

"Your orator's said lines of telegraph, and its said offices and each of them, as now existing, and the present location of said lines of telegraph, and each of them, are hereafter more fully described.

"The said lines of telegraph as they exist at present are substantially the same as the telegraph lines originally constructed, and the location of each telegraph line is substantially the same as the original location occupied at time of original construction.

"The said lines of telegraph, and each of them, were originally constructed, and have since been continuously reconstructed, operated, and maintained, by your orator and its predecessors in title and estate at great cost and expense to your orator and its said predecessors, for the purpose of forming a part of their respective systems of telegraph and a component part thereof, and a necessary connecting link therein, to enable your orator and its predecessors to fulfill the purpose for which they were respectively organized and incorporated, to transmit messages over said lines, and each of them, for the public, and, since the acceptance by your orator of the provisions of the above-mentioned act of Congress of the United States dated June 24, 1866, to transmit messages as therein provided and required, and to transmit telegrams over said lines pertinent to the maintenance and operation of the telegraph lines and business of your orator and its predecessors in title; and said telegraph lines have been continuously so used by your orator and its predecessors from the time of the original construction of said lines, and each of them, to the present time, all of which was well known to all persons, including defendant, owning and having any interest, easement, or right in, to, or upon the land upon and over which said lines of telegraph were originally constructed, and have been and now are maintained, and operated; yet the said defendant did not during all of said time, until as hereinafter mentioned within the last few months, object to the construction, reconstruction, maintenance, and operation of said telegraph lines, but, on the contrary, assented thereto with the knowledge that said lines of telegraph, and each of them, so constructed and maintained, would become a permanent part of the telegraph system of your orator and of its predecessors in title and that said systems of telegraph, and each of them, were to be of permanent and perpetual duration; nor has any person other than defendant owning or having any interest in the land upon which your orator's said telegraph lines have been and are constructed and maintained ever objected to the construction, reconstruction, maintenance, and operation thereof, but have either assented thereto and permitted the same, or are by their silence and failure to object now estopped from objecting thereto."

There are other paragraphs making substantially, but in different ways, the same allegation. It is alleged in various ways that the plaintiff, since the year 1866, when it, the plaintiff corporation, acquired the rights claimed, has continuously constructed, reconstructed, maintained, and operated its lines along the defendant's right of way, without substantially changing the location thereof upon or along said right of way, so that the location of said telegraph lines, poles, superstructures, supports, wires, fixtures, and attachments occupy to-day substantially the same location on or along said right of way as they occupied at the time the telegraph company took possession thereof. In substance the plaintiff alleges that, notwithstanding the contracts made and entered into between it and the defendant company, it has had all along and still has a right in and to the occupancy of the right of way of the defendant company with its poles; that it not merely

owned its poles, wires, etc., but that it has and owns an easement in the right of way which it has so long occupied. The Telegraph Company claims that the contracts between it and the defendant Railroad Company were mere working agreements, and did not, by their terms, fix a period, or attempt to do so, when the right to occupy the right of way with its poles, wires, etc., should cease. It alleges, also, that the attitude, demand, and purpose of the defendant Railroad Company have placed a cloud upon its rights and title in and to the easement which it claims upon and along the defendant's right of way, and constitute a menace to the operation of its telegraph lines on the defendant's right of way and property and its ability to serve the public and the government as a common carrier.

The plaintiff then claims that it acquired certain rights under the act of Congress approved July 24, 1866 (14 Stat. 221, Rev. St. § 5263 et seq.). This act of 1866, the provisions of which it accepted in writing June 5, 1867, is claimed to be the basis for certain federal rights growing out of it. Its claim in this respect, the Telegraph Company says, constitutes a controversy under the Constitution and laws of the United States, upon the determination of the validity and construction of which the result of this case may depend. The matter for determination in respect to this statute of 1866 is stated in this way:

"(a) What is the true construction, force, and effect of title 65 of the Revised Statutes of the United States? What right, title, or interest was thereby given, was possessed during the time hereinbefore mentioned, and is now possessed, by the United States in your orator's telegraph lines, property, effects, and easements upon or along defendant's right of way?

"(b) What was the effect of the contracts entered into between your orator and defendant, dated January 17, 1891, and March 26, 1902, hereinbefore mentioned, and how must those contracts be construed in connection with title 65 of the Revised Statutes of the United States?

"(c) And is not the defendant, by virtue of the said law of the United States embodied in title 65 of the Revised Statutes, prevented from removing, damaging, impairing, or interfering with your orator's telegraph lines, property, and effects upon or along defendant's right of way, and with the construction, maintenance, and operation of said lines, or from interfering with the operation by your orator of its said telegraph lines upon or along defendant's right of way?

"(d) And is not your orator by the same law required and compelled to maintain and operate its said lines of telegraph upon or along defendant's right of way?"

The allegations in reference to the injury which the plaintiff apprehends, necessitating its applying for an injunction, are as follows:

"On the 2d day of July, 1913, the said Atlanta & West Point Railroad Company and the Western Railway of Alabama notified your orator that they and each of them desired to cancel the last-named working agreement dated March 26, 1902. Thereafter your orator notified the said defendant that, possessing an irrevocable, assignable, perpetual easement or right to maintain and operate its said lines of telegraph upon and along the defendant's right of way, which easement would continue to exist after the expiration of said working contract, it would continue to maintain and operate its said lines of telegraph upon or along its said right of way, and offered to enter into a new contract with defendant for reciprocal service if the defendant desired, and if satisfactory terms could be agreed upon. Thereafter negotiations for a new contract were entered upon, but your orator and the defendant have

been unable to agree upon terms for a new working agreement. The defendant has notified your orator that it denies that your orator has a perpetual, irrevocable, assignable easement and right to maintain and operate its telegraph lines upon or along its right of way, and denies that it will be under any obligation to perform any service for your orator, declines to perform any service for your orator after the termination of the present contract, which, by mutual agreement, has been extended to and including April 3, 1915. The defendant has further advised your orator that it denies that your orator has any right whatever on or along its right of way, and demands that upon the termination of the present working contract the said telegraph lines, poles, wires, structures, and implements of your orator be removed from their present location, and that your orator desist thereafter from constructing, reconstructing, maintaining, and operating said telegraph lines, and each of them, upon or along defendant's right of way, and desist from operating the telegraph stations, offices, and depots of your orator now established, maintained, and existing upon and along defendant's said right of way, and have intimated that, should your orator fail to comply with its said demands and requests, it will interfere with and remove, or attempt to remove, said telegraph lines, poles, wires, structures, instruments, and properties of your orator from their present location, and interfere with the operation by your orator of its said telegraph offices, depots, and stations upon or along defendant's right of way."

It is claimed in the bill that it is necessary for the Telegraph Company to resort to equity:

(a) To obtain the full and complete relief to which it is entitled.

(b) To avoid a multiplicity of actions and vexatious and expensive litigation.

(c) To avoid large damages, pains, and penalties to which it might be subjected for its failure to furnish telegraph service to the public and to the government.

(d) To prevent by decree of this court any discontinuance of, or interference with, its telegraph service upon or along the defendant's property.

(e) To obtain a decree of this court lifting the cloud upon its title and interest in its said easements or rights, and fully, finally, and completely determining and establishing its said easement upon or along the defendant's right of way.

(f) In case there should be a final decree, if the rights claimed are not irrevocable, assignable, and perpetual, and will not become so unless compensation be paid by the plaintiff to the defendant, or that the defendant is entitled to compensation, that the decree be rendered determining the amount of such compensation, if any, which should be paid by the Telegraph Company to the Railroad Company for the purpose of obtaining an irrevocable, assignable, and perpetual easement over the property in question.

(g) That in any event it will be necessary that the court should retain control of this litigation for the purpose of preventing interference with the plaintiff in its occupancy of the defendant's right of way until it can have a decree or judgment determining what it shall pay the defendant for the use of said right of way and a decree determining the amount of compensation to be paid by defendant to plaintiff for the temporary support of its said telegraph wires on the cross-arms, poles, and fixtures of the plaintiff upon or along the defendant's right of way and for the maintenance and repair thereof by your orator, should defendant desire

said wire to remain temporarily upon said poles, and restraining the defendant from maintaining and repairing such wires owned by it, inasmuch as it would be injurious to said telegraph lines and to the public service to permit two different sets of employés, employed by two different masters, to attempt to repair and work upon said telegraph lines.

(h) To prevent the immeasurable and irreparable loss and damage which the Telegraph Company would sustain, should its lines of telegraph along the defendant's right of way be destroyed, removed, or discontinued, for which damage proper or adequate compensation could not be obtained at law.

The prayers of the bill then are: (1) For a judgment or decree removing the cloud on plaintiff's title, as alleged; (2) for a judgment or decree enjoining and restraining the defendant from interfering with the plaintiff's telegraph lines along the defendant's right of way; (3) in the event it should so happen that the judgment or decree should determine that the Telegraph Company's easements, rights, titles and interest in, upon, under, along, through, or over defendant's right of way, property, and houses, or any part thereof, are not irrevocable, assignable, and perpetual, and are not to become so unless compensation be made therefor, that a decree be written determining the amount of such compensation, if any, which should be paid by the Telegraph Company to the Railroad Company; (4) for a restraining order and for subpœna.

The case is now heard on motion by defendant to dismiss. The grounds of said motion are:

First. That there is an insufficiency of facts mentioned in the bill and the exhibits thereto to maintain an equitable cause, because the allega·tions in the bill do not entitle the plaintiff to the measure of relief sought, or to any relief. That there are no well-pleaded facts in the bill justifying the plaintiff's assertion of and claim to a perpetual easement or other right or interest entitling it to occupy by its lines of telegraph defendant's right of way, etc. That the allegations in the bill state no valid equitable cause of action in favor of plaintiff under the laws and statutes of the United States, that the acts of Congress pleaded and plaintiff's acceptance thereof give no easement, right, or title to occupy defendant's right of way, etc., against its wishes and without its consent, and that there is no foundation for the plaintiff's claim (through alleged federal right) to remain upon and occupy defendant's right of way, nor does plaintiff make in said bill a valid and real federal question pertinent to its assertion of equitable rights, calling for equitable relief, but the questions sought to be set up are moot and speculative. That there are contained in the bill no sufficient and requisite averments of fact, justifying and substantiating the alternative cause of action sought to be set up, that there are no facts properly alleged which entitle complainant to have decreed by the court an easement or other right or interest by the payment of money to the defendant, etc. That plaintiff has failed to show by any well-pleaded facts that it has any easement, all of its allegations with respect thereto being unsupported conclusions. Indeed, if it has the right of condemnation, the statutes of the state are adequate for the exercise of this power, and a resort to equity is unnecessary.

Second. That there is a misjoinder of asserted causes of action in the bill, for that there are united therein several claims so different in character and so inconsistent each with the other as to render it improper that they should be litigated in the same cause. That the bill is not only multifarious, but also duplicitous.

Third. That the matters and things appearing upon the face of the bill affirmatively show that there are no equitable causes of action set out therein, and plaintiff by its own averments is deprived of any of the equitable relief sought. That the bill shows that the plaintiff has no perpetual, irrevocable, and assignable easement; that it has no equity which would justify the court in decreeing in its favor an easement upon the payment of money to the defendant; that it has no right to occupy the defendant's right of way, etc., by virtue of any right which the government of the United States may have. That the allegations of the bill and exhibits thereto conclusively show that plaintiff was a tenant or a licensee upon the right of way and other premises of the defendant, and that such tenancy and license have expired.

Fourth. That the bill shows that the plaintiff has complete remedy at law.

[1] The first question that arises in this case is: "What do the contracts between the plaintiff and defendant mean?" Were the agreements such that thereby and therein a term was provided as to which the Telegraph Company should have the right to occupy the defendant's right of way with its poles and wires, and the Railroad Company's depots and offices with its apparatus and appliances for transmitting messages, or were they, as contended by the Telegraph Company, mere working agreements concerning the manner in which the business of the companies should be carried on and with reference to the rights of the parties respectively as to the manner of conducting this business during the period named in the agreement?

It is only necessary to construe the last agreement between the parties, because it is the last, and because it is the expiration of that agreement which gives the Railroad Company the right, if it has it, to require the Telegraph Company to cease to occupy its right of way, depots, etc. I think the language of the whole agreement tends to show very conclusively that the agreement covered the right to occupy the rights of way of the Railroad Company, and it is to this right that the limitation period of the contract applied. Not considering other parts of the agreement, I think the language of paragraph 6 is sufficient to show that this was meant. The language of this paragraph is:

"The Railroad Companies, so far as they legally may, hereby grant and agree to assure to the Telegraph Company the exclusive right of way, on, along, and under the line, lands, and bridges on both sides of the tracks of the railroads now or hereafter covered by this agreement, and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires, and underground or other lines for commercial or public telegraphic and telephonic uses or business, with the right to put up or construct, or cause to be put up or constructed, from time to time, such additional wires," etc.

I do not see how any other meaning can be put upon this clause of the contract than that, at the time this last contract was entered into,

in 1902, the Telegraph Company realized and understood that it had no legal right upon the Railroad Company's right of way, or at all events that any right it might have claimed was so doubtful that it entered into this contract for the additional seven years' occupancy of the right of way and the additional rights mentioned in the agreement as to one year's additional occupancy, notice, etc. The acceptance of an agreement containing this language granting a right of way along the Railroad Company's line by the Telegraph Company shows necessarily that it either did not consider that it had that right before, or that it was so doubtful as to justify it in entering into this agreement. It is perfectly clear that the rights of the plaintiff to occupy the defendant's right of way and its depots and offices is ended, and was ended when this bill was filed, and that the Railroad Company has the right to insist that the Telegraph Company remove its poles, wires, and fixtures and office apparatus from its right of way and depots. It is unnecessary to consider what the Telegraph Company's prescriptive rights would have been to occupy the Railroad Company's right of way, considering the length of time it had been there, if these contracts had not been made. I think it perfectly clear that after these agreements were entered into the Telegraph Company became the tenant or licensee of the Railroad Company, and that its tenancy or rights as a licensee were terminated and ended by the expiration of the period named in the last agreement.

[2] I am wholly unable to see how any rights can be claimed in behalf of the Telegraph Company from the act of Congress of 1866. That act provides that any telegraph company then organized, or which may be thereafter organized under the laws of any state in the Union, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States and along any military or post roads of the United States, which have been or may hereafter be declared such by act of Congress, and over, under, or across the navigable streams or waters of the United States, provided they are so constructed as not to obstruct the streams or interfere with travel along the military and post roads. It then gives the right to use material from the public lands necessary for the construction, maintenance, and operation of its lines, and provides that it may pre-empt and use such portion of the unoccupied public lands subject to pre-emption through which its lines of telegraph may be located as may be necessary for its stations, not exceeding 40 acres for each station, such stations not to be less than 15 miles apart. The second section provides that telegraphic communications between the several departments of the government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster General. The third section provides that the rights granted by this act shall not be transferred or assigned by any company acting under this act to any other corporation, association, or person: Provided that the United States may, after the expiration of five years from the date of the passage of the act, purchase all the telegraph lines,

property, and effects of any or all of said companies at an appraised value, to be ascertained by five competent, disinterested persons, two of whom shall be selected by the Postmaster General and two by the company, and one by the four previously selected. And section 4 provides that, before any telegraph company shall exercise any of the powers or privileges conferred by this act, it shall file its written acceptance with the Postmaster General of the restrictions and obligations required by this act.

This, as stated above, the Western Union Telegraph Company did in 1867. The only ground which has been urged here, so far as I understand the argument in favor of the rights under this act of Congress, is that Congress may, at any time, require the company to sell to it, and if its lines be interfered with and disintegrated, and especially this line over the Atlanta & West Point Railroad be taken from it, that it would be unable to comply with that to which it claims it has obligated to the government, that it could purchase the property at an appraised value whenever it should desire. A number of cases have dealt with the rights thus claimed under the act of 1866, but I think it is almost unnecessary to consider any of them, except the case of Western Union Telegraph Company v. Pennsylvania Railroad Company et al., 195 U. S. 540, 25 Sup. Ct. 133, 49 L. Ed. 312, 1 Ann. Cas. 517. That case deals so fully with the questions involved, and, in the opinion by Mr. Justice McKenna, recites so fully all previous cases on the subject and the questions involved, that consideration of any other cases would be useless. Perhaps it will sufficiently appear what was decided in that case by the headnotes, which are as follows:

"The act of Congress of July 24, 1866 (14 Stat. 221, Rev. St. § 5263 et seq.), giving telegraph companies the right to construct and operate their lines through, along, and over the public domain, military or post roads, and navigable waters of the United States, was a legitimate regulation of commercial intercourse by telegraph among the states and appropriate legislation to carry into execution the power of Congress over the postal service; it was merely an exercise of national power to withdraw such intercourse from state control and interference.

"This court has already held in Pensacola Telegraph Co. v. Western Union Tel. Co., 96 U. S. 1 [24 L. Ed. 708], and Western Union Tel. Co. v. Ann Arbor Railroad Co., 178 U. S. 239 [20 Sup. Ct. 867, 44 L. Ed. 1052], and now follows those decisions, that the act of July 24, 1866, does not confer upon telegraph companies the right to enter upon private property without the consent of the owner, or grant them the right of eminent domain.

"A railroad's right of way is property devoted to a public use, and has often been called a highway, and as such is subject, to a certain extent, to state and federal control; but it is so far private property as to be entitled to the protection of the Constitution, so that it can only be taken under the power of eminent domain, and a condition precedent to the exercise of the power of eminent domain is that the statute conferring it make provision for compensating the owner."

This case construes the act of July, 24, 1866, not only as it relates to the right of the Telegraph Company to occupy the right of way of a railroad, when it has once obtained it, continuously and permanently under the terms of this act (which I understand to be the Telegraph Company's claim here), but also as to the right of the court to deal with the matter of compensation, if the Railroad Company is

entitled to compensation as a condition to its use and occupancy by the Telegraph Company, and to ascertain and determine, in an equitable proceeding, the amount of such compensation. Mr. Justice McKenna, in the opinion, quotes from Pensacola Telegraph Co. v. Western Union Tel. Co., 96 U. S. 1, 24 L. Ed. 708, as follows (195 U. S. 562, 569, 573, 25 Sup. Ct. 138, 141, 142, 49 L. Ed. 312, 1 Ann. Cas. 517):

"'It [the act of 1866] gives no foreign corporation the right to enter upon private property without the consent of the owner and erect the necessary structures for its business, but it does provide that, whenever the consent of the owner is obtained, no state legislation shall prevent the occupation of post roads for telegraph purposes by such corporations as are willing to avail themselves of its privileges.' And again (96 U. S. 12): 'No question arises as to the authority of Congress to provide for the appropriation of private property to the uses of the telegraph, for no such attempt has been made. The use of public property alone is granted. If private property is required, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized. State sovereignty under the Constitution is not interfered with. Only national privileges are granted.'"

Further on in the opinion Mr. Justice McKenna uses this language:

"But in the act of July, 1866, there is not a word which provides for condemnation or compensation. The rule that when a right is given all the means of exercising it are given does not, as we have seen, apply to the extent contended for by the Telegraph Company. The exercise of the power of eminent domain is against common right. It subverts the usual attributes of the ownership of property. It must, therefore, be given in express terms or by necessary implication, and this was the reasoning in the Pensacola Case and applied directly to the act of 1866. We may repeat the language of the court: 'If private property is required, it must, so far as the present legislation is concerned, be obtained by private arrangement with its owner. No compulsory proceedings are authorized.'"

And before concluding the opinion this additional expression is used:

"It follows from these views that the act of 1866 does not grant the right to telegraph companies to enter upon and occupy the rights of way of railroad companies, except with the consent of the latter, or grant the power of eminent domain."

Considering this decision by the Supreme Court, it seems entirely unnecessary to consider further the question as to the rights the Telegraph Company gets by virtue of the act of 1866, and its acceptance of the same. It could not occupy and use the right of way of the Railroad Company without its consent, and that consent was obtained for a limited period of time, which time has expired. So far as this act of 1866 is concerned, the Telegraph Company cannot, by any of its provisions, condemn property of the Railway Company.

Another contention here, however, is, as I gather from the argument and the briefs, that the court, independently of this act and under its general power as a court of equity, may provide compensation to the Railroad Company for the Telegraph Company's occupancy of its right of way, and, further, that the court may, by injunction, prevent the Railroad Company from removing the Telegraph Company and its poles, wires, and general equipment from its right of way and depots until such proper compensation can be ascertained and decreed. This question was presented to the Circuit Court of Appeals for the

Sixth Circuit, in Western Union Telegraph Company v. Ann Arbor R. Co., 90 Fed. 379, 33 C. C. A. 113. That court, through Circuit Judge Taft, said, after quoting from Pensacola Tel. Co. v. W. U. Tel. Co.:

"The authority establishes, if authority were needed, that the telegraph company cannot occupy the line of defendant's railroad without the consent of defendant, or the consent of some predecessor in title, which is binding on the defendant. This, we have seen, is wanting. The suggestion, however, seems to be, if we understand it, that, because of the public necessities, the court ought to use its injunction process and shape its decree so as to effect an equitable condemnation of the easement of way. The court has no such power."

To sum up this whole case, it is this: The Telegraph Company voluntarily entered into an agreement with the Railroad Company for the occupancy of its right of way for a limited period, and that period has expired, and the Railroad Company has the right to demand that it cease the occupancy of its right of way. Its rights are not aided by the act of Congress or any federal right it may have, and, further, it is not the province of this court to condemn land, or to condemn rights in land, as here claimed.

I do not think that the plaintiff's bill states a case upon which any recovery can be had, or any decree in its favor granted. The result is that the bill must be dismissed.